UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21 Cr. 54 (RPK) |
| Plaintiff, | |
| v. | |
| DAVID GENTILE, *ET AL*. | |
| Defendant. | |

## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT JEFFREY LASH

GOTTLIEB TOWNSEND

THE JANEY LAW FIRM PC

111 Broadway, Suite 701
New York, NY 10006
Tel.: (212) 566-7766
Fax: (212) 374-1506

*Attorneys for Defendant*
*Jeffrey Lash*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ………………………………………………………… iv

I.    PRELIMINARY STATEMENT .................................................................1

II.   OBJECTIONS TO THE PSR AND ADDENDUMS ................................................1

   A.    ¶¶22; 43-54 – The Guidelines Calculation ........................................1

       i.    The Performance Guarantees ................................................2

       ii.   The Equitability of the Loss Calculation Relative
             to the Co-Defendants ………...............................................4

       iii.  Sophisticated Means ………..................................................5

       iv.   Association with an Investment Advisor ………...........................6

       v.    Obstruction………….............................................................7

       vi.   Downward Departure Variance for Minimal Role………..................8

   B.    ¶17 – The 2014 Inaccurate Performance Guarantees ........................10

   C.    ¶18 – The 2015 Inaccurate Performance Guarantee .........................11

III.  SECTION 3553(A) FACTORS ANALYSIS AS APPLIED TO MR. LASH........12

   A.    Nature and Circumstances of the Offense ....................................13

       i.    Background and Specific Offense Conduct ...............................13

           a.    Creation of GPB............................................................13

           b.    The Fraudulent Performance Guarantees and Movement of Funds…15

           c.    Resignation from GPB and Settlement Negotiations ………...........16

   B.    History and Characteristics of the Defendant ...............................17

       i.    Personal Background ..........................................................17

       ii.   Professional Development, Marriage, and Family Life....................18

       iii.  Deterrence........................................................................22

    iv.    **Mr. Lash's Extensive Cooperation with the Government** ..........................22

        a.    **The Instant Case** ......................................................................22

        b.    **The Securities and Exchange Commission** ............................23

  **C.**    **Restitution** ...............................................................................................24

**IV.**    **CONCLUSION** ....................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**<u>Cases</u>**

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................12, 13

*Koon v. United States*, 518 U.S. 81 (1996) ............................................................17

*United States v. Booker*, 543 U.S. 220 (2005) .......................................................12

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ...........................................12

*United States v. Garcia*, 920 F.2d 153, 155 (2d Cir. 1990) .....................................9

*United States v. Guldi*, 141 F.4[th] 435 (2d Cir. 2025) ..............................................5

*United States v. Quintero-Leyva*, 823 F.3d 519 (9th Cir. 2016) ..............................10

*United States v. Regensberg*, 635 F. Supp.2d 306 (S.D.N.Y. 2009) ...........................7

*United States v. Rodriguez*, 44 F.4[th] 1229 (9th Cir. 2022) .....................................9

*United States v. Sanchez*, 925 F. Supp. 1004 (S.D.N.Y. 1996) ..................................9

*United States v. Soto*, 959 F.2d 1181 (2d Cir. 1992) ................................................9

**<u>Statutes</u>**

18 U.S.C. § 1343……..................................................................................……1

18 U.S.C. § 3553(A)............................................................................... *passim*

U.S.S.G. §2B1.1……..................................................................................1,6

U.S.S.G. §3B1.2............................................................................... *passim*

U.S.S.G. §3C1.1……...............................................................................……1

U.S.S.G. §3E1.1……...............................................................................……1

U.S.S.G. §4C1.1……...............................................................................……1

U.S.S.G. §5K1.1……..............................................................................1,23

## I.    PRELIMINARY STATEMENT

The first step towards making amends is taking responsibility for one's conduct, that is precisely what Jeffrey Lash has done. He stepped forward after being indicted, pleaded guilty to participating with Mr. Gentile and Mr. Schneider in a fraudulent scheme, cooperated extensively with the Government and then testified as the sole cooperator at the recent trial of Mr. Gentile and Mr. Schneider. While the evidence established that Mr. Lash was not the architect of the criminal conspiracy headed by Mr. Gentile and Mr. Schneider, nor involved in their wide range of illegal conduct, he admitted that he participated in the conspiracy. Having presided over the trial, Your Honor is well poised for the particular dimensions Mr. Lash seeks to present for the adjudication of his sentence which the defense proposes be a sentence of time-served, or, in the alternative, a non-incarceration sentence of probation for the reasons elaborated herein.

## II.    OBJECTIONS TO THE PSR AND ADDENDUMS

### A.    ¶¶22; 43-54 – The Guidelines Calculation

In the PSR, Probation calculates Mr. Lash's adjusted guidelines offense level to be 35. The level is then adjusted down five points due to his acceptance of responsibility and offender status, resulting in a final offense level of 30, which carries a corresponding guidelines range of 97-121 months. The following chart demonstrates how Probation and the defense calculate Mr. Lash's sentencing guidelines:

| CATEGORY | PROBATION | DEFENSE |
|---|---|---|
| **Base Offense Level** – 18 U.S.C. § 1343<br>USSG §2B1.1(a)(1): Wire Fraud | 7 | 7 |
| **Specific Offense Characteristics**<br>USSG §2B1.1(b)(1): Loss Calculation | **+24** | **+12** |
| **Specific Offense Characteristics**<br>USSG §2B1.1(b)(2)(a)(i): More Than 10 Victims | +2 | +2 |
| **Specific Offense Characteristics**<br>USSG §2B1.1(b)(10(C): Sophisticated Means | **+2** | **0** |
| **Specific Offense Characteristics**<br>USSG §2B1.1(b)(20): Investment Advisor | 0 | 0 |
| **Specific Offense Characteristics**<br>USSG §3C1.1: Obstruction of Justice | 0 | 0 |
| **Preliminary Offense Level** | **35** | **21** |
| **Acceptance of Responsibility**<br>USSG §3E1.1(a): General | -2 | -2 |
| **Acceptance of Responsibility**<br>USSG § 3E1.1(b): Timely | -1 | -1 |
| **Chapter Four Adjustment**<br>USSG §§4C1.1(a)(1)-(10): Zero-Point Offender | -2 | -2 |
| **Adjusted Offense Level** | **30** | **16** |
| **Mitigating Role**<br>USSG §3B1.2: Minor Participant | **0** | **-4** |
| **Final Offense Level** | **30** | **12** |

-1-

| Appropriate Guidelines Range | 97-121 Months | 10-16 Months |
|---|---|---|

We respectfully submit that the offense guidelines calculation by Probation in the PSR for Mr. Lash drastically overstates his offense conduct, inappropriately ignores his limited role in the criminal conspiracy, and incorrectly applies certain aggravating factors.

It should also be noted at the outset that Probation concedes in the PSR that a downward variance might be appropriate. PSR, at ¶113. We now address in turn the aggravating and mitigating issues, including the basis for a downward variance.

### i.    The Performance Guarantees

Mr. Lash's limited involvement in the broader criminal conspiracy orchestrated and directed by Mr. Gentile and Mr. Schneider offers a unique situation in analyzing both the defense's objections to the PSR and the §3553(A) factors. Your Honor will be better positioned to evaluate our objections to the PSR and also consider the §3553(A) factors by fully understanding the performance guarantees that are at the heart of Mr. Lash's involvement in the fraud conspiracy. How the personal guarantees came about, who was responsible for developing the scheme, who drafted them, and how Mr. Lash was pressured into executing them are critical to understanding the objections to the PSR that focus on i) loss amount, ii) the scope of Mr. Lash's minimal role, iii) sophisticated means, iv) the claims regarding obstruction of justice, and v) to support the defense's application for a downward variance.

At the outset, it is vital to understand that Mr. Lash's signing these performance guarantees constituted two specific instances of conduct within a much broader conspiracy that did not involve Mr. Lash, and spanned approximately four years.[1] The evidence at trial established that Mr. Gentile and Mr. Schneider operated GPB as a Ponzi scheme involving this fund, as well as other funds having no connection to Mr. Lash. This was the way they operated on a daily basis during the course of the time period identified in the Indictment.

The performance guarantees were a method of conducting accounting fraud. By submitting these documents to GPB's accounting department and external auditors, GPB was able to make representations about previous revenue that were untrue concerning the auto dealerships generating sufficient revenue to pay their distribution obligations – and even paying out additional special distributions despite the fund's precarious financial position. Mr. Lash admittedly knew that these guarantees would ultimately be used to falsify the balance sheets for GPB and that the investors would be given a false picture of GPB's performance. Rather than come clean to investors about the poor performance of the automotive fund's assets, Mr. Gentile and Mr. Schneider concocted a scheme to hide this information. Initially, the plan discussed between Mr. Gentile, Mr. Schneider, and Mr. Lash was for Mr. Gentile to take money he was paid through the management fees and return it to the automotive portfolio so that the fund would then have a sufficient balance to pay the distributions promised to the investors. However, Mr. Gentile and Mr. Schneider never followed through with this plan.

---

[1] Two of the three guarantees were signed at the same time in a single criminal transaction.

Instead, Mr. Gentile and Mr. Schneider, together with GPB's attorney, Mr. Prestiano, decided to have Mr. Lash personally guarantee a specific profit margin for the performance of two dealerships, Volkswagen White Plains and Volkswagen Oneonta. As per the four corners of the agreements, if the dealerships involved did not generate revenue at a fixed level, Mr. Lash would personally make up the differences. The first two performance guarantees were initially signed in 2015 despite the document being drafted to indicate the agreement took place in January 2014. Accordingly, at the time of their execution, the revenues of the two dealerships involved were already known and were well below the guaranteed amounts. By pursuing what were termed to be "performance guarantees," Mr. Lash was instructed by Mr. Gentile and Mr. Schneider to sign promissory notes to GPB, with the amounts already determined, which could then be booked in GPB's accounting ledger as revenue. Mr. Gentile verbally made it clear to Mr. Lash that he would **not** be expected to ever actually personally pay the amounts owed, and that Mr. Gentile would find a way to resolve the guarantees at a later date without Mr. Lash suffering any financial burden. *See*, *generally*, Tr., at 3077-3078; 3104-3106.

It is critical to note that the evidence established that Mr. Lash did not participate in any of the conversations that led to the initial decision and plan to abandon returning the management fees in favor of drafting and backdating these performance guarantees. He never was afforded an opportunity to offer a different solution or voice an objection. Further, having never personally guaranteed the performance of any dealership in the past, he was reluctant to sign. *See*, *generally*, Tr., at 3090-3093; 3095-3096; 3106-3114.

When Mr. Lash questioned and balked at signing the guarantees, he was confronted with unrelenting pressure from Mr. Gentile and Mr. Schneider to sign the performance guarantees that they had prepared. Mr. Lash was told that GPB would go out of business if he refused to sign the guarantees thereby jeopardizing his financial security. This pressure ultimately resulted in Mr. Lash acquiescing and signing the guarantees which were then provided to the accounting department so the corporate balance sheets would reflect additional income sufficient to cover the distributions. Tr., at 3106:14-23.

The following year, in early 2016, the exact same situation presented itself at GPB. The expected revenue from the dealerships was insufficient to make the promised distribution payments to investors. Again, Messrs. Gentile and Schneider devised a performance guarantee plan to cover the shortfall and contacted Mr. Lash with instructions that he was required to sign another promissory note, this time for the Country Motors II (aka Bob's Buick) dealership, to guarantee certain profits for the year 2015. The agreement was also backdated again to cover the previous year despite no agreement, verbal or written, ever having been in place to guarantee the dealership's returns. Mr. Lash was again left out of the process when the decision was made to utilize a fraudulent performance guarantee and was simply given a command to sign another agreement. He was presented with the document already drafted and instructed to sign it. At the meeting when Mr. Gentile and Mr. Schneider issued this order, Mr. Lash initially stormed out of the room in anger. Tr., at 3185:13-3186:18. Days later, he finally capitulated after repeated pressure in the form of phone calls with the attorney, Mr. Prestiano, while Mr. Gentile refused to have a conversation with him to address his concerns. Tr., at 3186:19-23. Instead, Mr. Gentile instructed Mr. Prestiano what to say to Mr. Lash to pressure and persuade him to sign the agreement. And, ultimately, Mr. Lash did sign the document in the Spring of 2016. Mr. Gentile

then again promised Mr. Lash that he would not be financially responsible for the amount specified. Tr., at 3187:25-3188:2.

We turn to our specific objections to the PSR.

### ii.    The Equitability of the Loss Calculation Relative to the Co-Defendants

As the Court is aware, Your Honor did not agree with Probation's determination in Mr. Gentile's and Mr. Schneider's PSR that the total loss of this overall conspiracy was $98.5 million. In fact, as to Mr. Gentile and Mr. Schneider, the Court calculated +18 (as opposed to +24) for the specific offense characteristic related to loss amount. May 9, 2025 Sentencing Transcript, at 37:5-11. When this Court considers Mr. Lash's limited role in the overarching fraudulent conspiracy, we submit that Mr. Lash's loss guidelines is appropriately less than that found applicable to Mr. Gentile and Mr. Schneider.

The trial evidence that resulted in Mr. Gentile's and Mr. Schneider's convictions as well as Probation's fulsome description of the "distribution scheme" places the gravamen of the fraud on the co-defendants, Messrs. Gentile and Schneider. Armed with actual knowledge of the problematic financial performance of GPB funds, Mr. Gentile and Mr. Schneider concealed the poor performance of GPB funds from investors. PSR, at ¶11. It was Mr. Schneider who instructed Ascendant Capital employees to relay to broker-dealers that the distributions in the Automotive Portfolio in 2015 would be fully covered, and any delay in deploying capital was "intentional and part of an overall, long-term strategic plan." PSR, at ¶13. Indeed, it was Mr. Gentile and Mr. Schneider, not Mr. Lash, who actually transferred the approximately $98.5 million from the investment capital account of Holdings I, Holdings II and the Automotive Portfolio to their respective distribution accounts to fund the 8% annual distribution to the investors. Mr. Lash was **not** involved in any of these transfers.

The context and limited scope of Mr. Lash's involvement is highly probative for the purposes of sentencing analysis and whether, again - taking the Probation guidelines calculation on its face - he should be held to the same standard as the other defendants in determining loss amount.

The PSR further makes the point that Mr. Gentile and Mr. Schneider authorized "special distributions against the advice that it could not be afforded." PSR, at ¶15 (internal quotations omitted). Not only was Mr. Lash not involved in authorizing "special distributions," he opposed this action by speaking out against the use of the funds in this way. Tr., at 3159:18-22. As the evidence showed, his objections were simply rejected.

However, under any analysis, Mr. Lash should **not** be treated the same as either Mr. Gentile or Mr. Schneider for points calculation pertaining to the loss amount. Simply put, while we acknowledge that this is a conspiracy case, from an equitable standpoint, Mr. Lash was not the driver of the loss or even reasonably aware of the extent of it. Mr. Lash did not participate in pitch meetings to investors where misrepresentations were made during the period of the conspiracy. Nor did he instruct employees to conceal information that would have upended the fraudulent scheme or facilitated any of the transfers that defrauded investors.

Mr. Lash's specific conduct is covered at length, *infra*, in the discussion regarding his role in the conspiracy and the actions he took to further its goals. What remains clear for the purposes of an equitable calculation of the loss attributable to Mr. Lash in this case, is that the evidence at the trial reinforced that Mr. Gentile and Mr. Schneider operated as leaders and organizers of the fraudulent scheme, using an intricate knowledge of accounting and deceptive messaging tactics to investors to solicit investments which, in turn, resulted in losses. While we do not dispute that these guarantees were central to the scheme, Mr. Lash played a relatively small role in the fraud by signing them. Consequently, considering the relative conduct of Messrs. Gentile and Schneider, as contrasted to that of Mr. Lash, a +12 point increase would accurately take into account the acute disparity of actions and control between Mr. Lash and his co-defendants.

### iii.    Sophisticated Means

At sentencing for Mr. Lash's co-defendants, the Court applied the sophisticated means enhancement to Mr. Gentile but did not apply it against Mr. Schneider. After arguments by the Government seeking to add this enhancement to both defendants at the sentencing, the Court rejected application of this enhancement to Mr. Schneider on the grounds that the overall scheme to defraud the investors involved sophistication and complexity, but Mr. Schneider's individual conduct did not. *See*, May 9, 2025 Sentencing Transcript, at 64:14-65:5. We submit that Mr. Lash is one step further removed from this particular factor than Mr. Schneider, and as a result should not receive points for this enhancement.

The Second Circuit has held that this enhancement is warranted when both the overall scheme as well as the defendant's individual conduct is especially complex or especially intricate. *United States v. Guldi*, 141 F.4th 435, 453 (2d Cir. 2025). The particular conduct of the defendant must also be taken into account. *Id*. Thus, a participant in a scheme that is deemed sophisticated or complex overall may **not** be subject to the enhancement if that defendant's particular conduct was not especially intricate. *Id*.

When examining the specific conduct attributable to Mr. Lash, it is clear that his conduct was not complex. Even acknowledging that he was aware that the performance guarantees were intended to be offered to GPB's accounting department, the signing of his name to a fraudulent document is not especially complicated or sophisticated. Creating or devising a scheme to adopt accounting tricks to dupe investors into believing a false balance sheet may be sophisticated, signing a document for that purpose is not.

Mr. Lash testified that while he still believed Mr. Gentile was going to return money, he was called down to a meeting that felt "staged." Tr., at 3105:9-12. At this meeting, Mr. Gentile informed him "we've got a way to solve the problem of the shortfall," and proceeded to tell Mr. Lash that he wanted him to sign a backdated performance guarantee. Tr., at 3105:13-21. At this point, Mr. Schneider told Mr. Lash that if he signed the performance guarantees, "it will help me," and claimed that there was an additional issue with some investors because Mr. Lash was a previous owner of the dealerships; Mr. Schneider claimed that execution of the guarantees would solve that issue as well. Tr, at 3105:22-3106:5.

While the overall fraudulent scheme was complex, Mr. Lash's specific conduct took place only after the architects of the fraud had manufactured the nature of the criminal act and had already drafted the guarantees they needed Mr. Lash to sign. Mr. Lash lacks the specialized industrial knowledge to craft such an artifice. He is not an accountant; he does not have the training or experience to fabricate revenue out of promises. He is also not a securities vendor; he does not have institutional knowledge concerning what necessary disclosures are made in a private placement memo or investor disclosure statement. What made this scheme so complex and sophisticated was the combination of technical accounting with the tailored messaging to potential investors that was created and carried out by Mr. Gentile and Mr. Schneider. Neither of those correspond to Mr. Lash's contribution to the conspiracy.

Accordingly, while we do not dispute that the overarching scheme itself was sophisticated, and the means employed by Mr. Lash's co-conspirators were complex, the specific conduct attributable to Mr. Lash does not fit within this category and he should not receive additional points for sophisticated means.

### iv. Association with an Investment Advisor

While we note that the PSR does not include the four-point enhancement for association with an investment advisor pursuant to USSG §2B1.1(b)(20), the Government did request this enhancement for both Mr. Gentile and Mr. Schneider. In anticipation of the Government requesting that Mr. Lash be subject to the four points enhancement for association with an investment advisor, we offer the following argument against it.

This enhancement is intended to hold accountable individuals who act in their capacity as experts in the securities field, or purveyors of funds who regularly communicate with potential investors about the risks and upsides of investing in said funds and are compensated for offering their expert opinions on these matters. Rather than operate as a manager in the investment advisor, GPB, Mr. Lash simply managed the assets that the fund owned, the dealerships. This is a significant distinction.

USSG §2B1.1(b)(20)(A)(iii) permits a four-point enhancement "[i]f the offense involved a violation of securities law and, at the time of the offense, the defendant was … an investment adviser, or a person associated with an investment adviser." Section 202(a)(11) of The Investment Advisers Act of 1940 provides the definition of investment advisor, which is described as "any person who for compensation … engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."

District court judges have understood that simply working for a company that is registered as an investment advisor is insufficient to qualify to have this aggravating factor applied. In *United States v. Regensberg*, the defendant was convicted of multiple counts of wire fraud and securities fraud in a multi-year scheme with hundreds of instances of theft and conversation. 635 F. Supp.2d 306 (S.D.N.Y. 2009). The Government sought to apply the four-point enhancement to Mr. Regensberg but Judge Marrero declined to incorporate association with an investment advisor into the calculation. *Id*, at 311. Specifically, the Court noted that Regensberg did **not** receive

compensation in return for the business of providing advice to others, but instead received a portion of the profits that the investor garnered from his or her investments. *Id.* Receiving compensation for providing advice was a key factor in the application of this enhancement.

At GPB, Mr. Lash's role was limited to sourcing automotive dealerships to acquire and running the dealerships. He did not work on the securities/fund aspect of the company; he was there to ensure that the assets produced income by operating and managing the physical dealerships. He has no accounting background, he holds no licenses which permit him to advise or trade in securities, he has no securities or commodities knowledge or experience. During the time period of the Indictment he was never personally compensated for dispensing investment advice or recommendations. Mr. Gentile and Mr. Schneider curated the entirety of the aspects of this fraud that this enhancement was intended to punish.

### v.    Obstruction

Although Probation's calculation does not include an enhancement for obstruction of justice, it is our understanding from recent conversations with the Government that it intends to include this aggravating factor in its guideline's calculation. For the following reasons, we strenuously object to its application to Mr. Lash.

At the outset, it is important to note that neither Mr. Gentile nor Mr. Schneider were subject to a guidelines enhancement for obstruction, nor was there a request made by the Government to apply such an enhancement. Imposing an additional penalty for Mr. Lash on the grounds that he was engaged in obstruction of justice that was directed and orchestrated by Mr. Gentile and Mr. Schneider, a situation that is only known because Mr. Lash voluntarily confessed to it, while Mr. Gentile and Mr. Schneider did not face such consequences would be manifestly unfair to Mr. Lash. Mr. Gentile, especially, was the primary driver and arbiter of the decision to portray the fictitious performance guarantees as legal instruments, and he held sufficient financial suasion over Mr. Lash to convince him to go along with that false narrative.

During Mr. Lash's trial testimony, he candidly recounted a situation where, after being interviewed by the FBI in April 2019, he met with Mr. Gentile and Mr. Schneider in Queens, New York. *See*, *generally*, Tr., at 3217-3223. During this meeting, Mr. Schneider appeared "concerned" (Tr., at 3218:18) and Mr. Gentile was "nervous and asking a lot of questions about accounting…" (Tr., at 3219:4-5). Mr. Gentile then wanted to ensure that everyone was "on team GPB" and would "stick to the story" about the guarantees. Tr., at 3219:10-15.

This placed Mr. Lash in an impossible situation. Upon hearing that the FBI was investigating the matter, Mr. Gentile threatened Mr. Lash "with removing his severance package and making life difficult for him if he diverged from the agreed upon story" about the performance guarantees and the transfer through Mr. Lash's account for the 2015 performance guarantee, indicating that it was a loan from Mr. Gentile. PSR, at ¶20. At this meeting, despite no longer working at GPB, Mr. Gentile still exerted an immense amount of control over Mr. Lash's life through his ability to dictate the payment of contractually obligated separation money.

-7-

Over the period of approximately one year, Mr. Lash negotiated three separate agreements to govern his departure from GPB; the first was executed in February 2018. As noted above, Mr. Lash was effectively strong-armed into accepting this deal despite several unfavorable terms. The agreement contained a payment schedule with an initial payment to Mr. Lash of $2,100,000 (two million one hundred thousand dollars) on February 12, 2018 and then a $65,000 (sixty-five thousand dollar) payment to Mr. Lash each month from March 2019-February 2020. *See*, February 10, 2018 Settlement Agreement, attached as Exhibit A, at 7.

In response to non-performance by GPB of its obligations under the agreement, a second amended agreement was signed on April 30, 2018. Under the terms of this amended agreement, the schedule of payments to Mr. Lash would keep the initial February 12, 2018 payment, but would then result in a $25,000 (twenty-five thousand dollar) payment to Mr. Lash each month from May 2018-April 2019, and a $20,000 (twenty thousand dollar) payment to Mr. Lash each month from May 2019-May 2022. *See*, April 30, 2018 Amended Settlement Agreement, attached as Exhibit B, at 6-9.

After another period of non-compliance by GPB, a third agreement was entered into on November 14, 2018. This agreement set new terms including a payment schedule for Mr. Lash that included both monthly and bi-weekly payments that extended through May 2022. *See*, November 14, 2018 Second Amended Settlement Agreement, attached as Exhibit C, at 3.

At the time of this meeting in Queens, GPB already owed Mr. Lash a substantial amount of money and there had been considerable difficulty in forcing GPB to pay on the agreed-upon schedule. Mr. Lash was concerned that Mr. Gentile would again breach the contract on behalf of GPB and refuse to pay him. Accordingly, when Mr. Gentile overtly threatened his severance package and told Mr. Lash that he would "[make] life difficult for him if he diverged from the agreed upon story" (PSR, at ¶20), Mr. Lash understood the message and its financial implications.

Mr. Lash would be reminded of this threat when Mr. Lash was contacted by a law firm hired by GPB to answer questions. After having a conversation with Mr. Gentile and Mr. Schneider about his meeting with the firm, Mr. Lash was accompanied to the meeting by Mr. Prestiano, who informed Mr. Lash that his presence there was to ensure that Mr. Lash stuck to the agreed-upon fabricated story. Tr., at 3221:17-21. While it was Mr. Prestiano who was physically present with Mr. Lash, it was abundantly clear to Mr. Lash that if he did not give the answers Mr. Gentile wanted, he would act on his threats.

### vi.    Downward Departure Variance for Minimal Role

In the PSR, Probation "acknowledges that a downward variance may be appropriate, as the applicable guidelines may overrepresent the seriousness of this offense."[2] *See*, PSR, at ¶113. Mr. Lash submits that when all the circumstances of his limited involvement are considered, a

---

[2] To be clear, Mr. Lash, for his part, acknowledges and agrees that the offense to which he pleaded guilty and the overall conduct for which he is charged is serious. The critical issue here is whether the Guidelines calculation overstates the implied punishment.

downward variance is certainly appropriate. Accordingly, Mr. Lash moves for a downward variance and offers the following considerations drawing from the Probation argument itself.

Specifically, we submit Mr. Lash is eligible for a four-level downward variance because he was a "minimal participant" within the meaning of USSG §3B1.2(a). The mitigating role downward variance adjustment applies to defendants, like Mr. Lash, who play a part in committing the offense that makes him "substantially less culpable than the average participant in the criminal activity," (*see*, USSG §3B1.2, Commentary Application Note 3 ("Note 3"), Federal Sentencing Guideline Handbook, vol. 2, 63).[3] In *United States v. Soto*, the Second Circuit held that a defendant has a burden to establish entitlement to the reduction by a preponderance of the evidence. 959 F.2d 1181, 1187 (2d Cir. 1992). In assessing whether an individual's role in a conspiracy warrants a minimal or minor role reduction, courts are instructed not to consider merely the defendant's exact role or status in the criminal activity, but rather to assess the defendant's culpability "in the context of all the circumstances." *United States v. Sanchez*, 925 F. Supp. 1004, 1011 (S.D.N.Y. 1996); *see*, *also*, *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir. 1990) (holding that the determination on application of minimal/minor role reduction is "heavily dependent upon the facts of the particular case" and is not based solely on an analysis of the defendant's necessity in the conspiracy).

While it is a fact that Mr. Lash signed the performance guarantees at the direction of Mr. Gentile and Mr. Schneider - an important element in the overall fraud scheme - he is not deemed ineligible for the four-level downward variance for having played an "essential" or "indispensable" role in the scheme. *Id* (affirming that while a drug courier is an essential or indispensable participant in a drug trafficking conspiracy, they may remain eligible for a reduction based on the individual facts and circumstances of the particular case).

In fact, in 2015, the Sentencing Guidelines Commission amended Note 3(C) to codify this notion and provided that the fact that a defendant performs an essential or indispensable role in the criminal activity is **not** determinative and does **not** bar a mitigating role adjustment, expressly abrogating cases in the Sixth, Seventh, Eighth and Tenth Circuits. *See*, Note 3, at 67. The Fifth and Ninth Circuits have held that this amendment is clarifying and thus applies retroactively. *Id*, citing *Untied States v. Sanchez-Villareal*, 857 F.3d 714 (5th Cir. 2017) (mitigating role amendment 794 is clarifying and applies retroactively); *United States v. Quintero-Leyva*, 823 F.3d 519 (9th Cir. 2016) (applying amendment to defendant who was sentenced before the amendment became effective, and remanding to reconsider the denial of a minor role reduction). The Tenth Circuit reversed and allowed a mitigating role reduction despite defendant's "indispensability" to the offense. *See*, Note 3, at 67-68. Thus, in addition to other adjustments concerning Mr. Lash's acceptance of responsibility and zero-point offender status, the four-level minimal role variance reduces Mr. Lash's total offense level by four points.

---

[3] In 2015, the Sentencing Guidelines Commission amended application Note 3(A) to agree with the Seventh and Ninth Circuits that the defendant is to be compared with other participants in "the criminal activity." *See*, *e.g.*, *United States v. Rodriguez*, No. 21-50108, 44 F.4th 1229, 1234 (9th Cir. Aug. 17, 2022) (Remanding for resentencing. "And even a defendant who knows some of the scope and structure of the organization, participates in some of the planning, and receives a large payment for his participation could still play a relatively minor role compared to his co-participants if they know more about the scope and structure of the organization, are more heavily involved of the planning, and receive a larger share of the proceeds. The key question is how the defendant compares with the other participants in the offense.")

Mr. Lash's downward variance application is directly supported by factors described by the Sentencing Guidelines when determining the minimal role reduction:

(i)     The degree to which the defendant understood the scope and structure of the criminal activity;

(ii)    The degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)   The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

(v)    The degree to which the defendant stood to benefit from the criminal activity.

USSG § 3B1.2, Commentary, Application Note 3(C). Furthermore, the Commentary provides that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." *Id.*

Here, Mr. Gentile and Mr. Schneider were partners and devised the structure for the scheme and led its execution. Mr. Lash was not an equal partner but was, in effect, a paid employee who derived a salary not from capital raised, but from the dealerships owned by the fund. In part, the nature of Mr. Lash's employment is precisely the reason Mr. Gentile was able to threaten Mr. Lash's severance when Mr. Gentile coerced him to abide by the "story" when the FBI was investigating the transfer of money in support of the fraudulent performance guarantee. Mr. Lash had no decision-making authority with respect to the scheme, inclusive of the structure and terms of the performance guarantees. His role was limited to participating in the conduct demanded by Messrs. Gentile and Schneider with respect to executing those performance guarantees. Consequently, we respectfully submit that a downward variance for minimal role is appropriate to apply to Mr. Lash in this case.

## B.    ¶17 – The 2014 Inaccurate Performance Guarantees

In PSR ¶17, the document discusses the <u>2014 Inaccurate Performance Guarantees</u>. The language of the PSR indicates that **Gentile, Schneider, Lash, and the GPB lawyer conspired together to create and then execute the fraudulent performance guarantees** which were backdated to cover the year 2014. The defense objection to this paragraph, as already discussed, *infra*, is that it provides an incomplete and misleading description of Mr. Lash's role in relation to the preparation and execution of performance guarantees relative to Mr. Gentile and Mr. Schneider. The evidence at trial established that it was Mr. Gentile, Mr. Schneider, and Mr. Prestiano, **not Mr. Lash**, who created the plan to use the backdated performance guarantees,

-10-

drafted them, and then brought the plan to Mr. Lash for his signature. Mr. Lash was not involved in the origination or discussion of how the scheme would work. During his testimony, Mr. Lash made it clear that he, Mr. Gentile, Mr. Schneider, and Mr. Prestiano had a discussion and determined that, to make up the shortfall in profits, Mr. Gentile and Mr. Schneider would refund fees to the fund. *See*, Tr., at 3104:3-25. Mr. Lash believed that to be the plan until a subsequent meeting when he first learned that Mr. Gentile, Mr. Schneider, and Mr. Prestiano had decided, **amongst themselves**, to fabricate and backdate two performance guarantees for GPB-owned dealerships and have Mr. Lash sign them. Tr., at 3105:8-3106:5.

He was approached only when the decision had already been made, and it was at that point that he first learned of the intention to use performance guarantees. In fact, Mr. Lash initially refused to sign the fraudulent guarantees when he was ambushed at this meeting. Tr., at 3113:3-6. Reluctantly and regrettably, he did agree and sign the documents a few days later. Tr., at 3114:23-3115:1.

Consequently, the PSR dramatically overstates Mr. Lash's culpability in this scheme. He was not a contributor to the planning of the fraudulent actions taken; he was pressured into participation in the scheme once Mr. Gentile and Mr. Schneider had already decided on how the fraud would take place and realized that it necessarily required his involvement.

## C.     ¶18 – the 2015 Inaccurate Performance Guarantee

PSR ¶18 presents the same argument as above for the 2015 Inaccurate Performance Guarantee. Here again, the testimony established that Lash was **not** involved in the discussion about creating this document, and was again approached only when that decision had already been made by Messrs. Gentile, Schneider, and Prestiano. In fact, at the conclusion of the meeting where Mr. Lash was ambushed with another demand to sign a backdated performance guarantee for a dealership, he refused to sign it. Tr., at 3185:13-15. Instead, Mr. Lash communicated his anger and confusion to GPB's attorney, Mr. Prestiano, reiterating that his understanding was that Mr. Gentile was planning to remit $1,500,000 (one million five hundred thousand dollars) back to the fund, and that he felt blindsided by this change in decision without so much as being involved in the conversation. Tr., at 3185:16-3186:18. Mr. Lash made several attempts to contact Mr. Gentile personally, but Mr. Gentile refused to answer the phone and discuss the matter with him. Tr., at 3186:19-23.

Days later, Mr. Lash regrettably bowed again to the relentless pressure he was facing and signed the 2015 performance guarantee, but he did not create it and was not involved in any of the discussions concerning the terms or parameters of the document itself. He was brought the finished document and commanded to sign it.

His participation was far less involved than the PSR indicates, and the report should be amended to accurately reflect the limited actions that Mr. Lash took in connection with the guarantees.

## III.    SECTION 3553(A) FACTORS ANALYSIS AS APPLIED TO MR. LASH

Since the Supreme Court decision in *United States v. Booker*, district courts have not been bound to sentence within the determined guidelines range.  543 U.S. 220 (2005).  Instead, the guidelines have become a factor which judges are instructed to take into account when determining an appropriate sentence.  Courts are permitted to tailor the sentence in consideration of other statutory concerns. *Id*, at 245.  With that in mind, the factors to be considered pursuant to §3553(A) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentence range established for –
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
>
> (5) any pertinent policy statement –
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(A)(1)-(7); *see also*, *Booker*, 543 U.S. 220.

In *Gall v. United States*, the Supreme Court emphasized the importance of an "individualized assessment based on the facts presented." 552 U.S. 38, 39 (2007).  Essentially, *Gall* instructs the sentencing court that a Guidelines calculation is the **initial benchmark** for determining a sentence, but it is not the only consideration.  *Id*.  Indeed, the Second Circuit has confirmed that district courts "must form [their] own view of the nature and circumstances of the offense and the history and characteristics of the defendant," and it is **emphatically clear**" that the guidelines are "**truly advisory**." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted) (emphasis supplied).  Relatedly, the Supreme Court has made

evident that a district court judge may depart – upwards or downwards – from the guidelines, as long as serious consideration is given, and an explanation is provided as to the unusually lenient or harsh sentence; extraordinary circumstances are no longer required.  *Gall*, 552 U.S. at 46.

We submit, for the reasons described in this memorandum, that Probation's guidelines range overstates the offense conduct, the defense calculation is an appropriate computation of the factors attributable to him, and that Mr. Lash's substantial cooperation and assistance provided to the Government and consideration of the Section 3553(A) factors warrant a non-incarceratory sentence.

## A.    Nature and Circumstances of the Offense

### i.    Specific Offense Conduct

Your Honor had the opportunity to observe Mr. Lash testify extensively, and credibly, over the course of three days during the trial in this matter.  In his testimony, he provided intricate details about his actions while at GPB.  From the outset in 2013, Mr. Lash intended and expected GPB to be a legitimately run fund driven by his capable management of automobile dealerships. Mr. Gentile was to oversee the overall enterprise and financials, Mr. Schneider would raise capital, and Mr. Lash would be responsible for, and limited to, ensuring that the fund asset dealerships were run profitably.  However, due to a confluence of multiple factors, some of the dealerships acquired and owned by the fund began to underperform.  As a result, the fund did not have enough money through the dealerships' net profits to pay out Mr. Gentile's and Mr. Schneider's promised distributions to investors, leading the criminal behaviors at issue in this case.

### a.    Background and Creation of GPB

Jeffrey Lash first met David Gentile under somewhat unfortunate circumstances.  Mr. Lash had been working as a non-equity manager at Major Chevrolet, a Long Island-based automobile dealership, in or around early 1996 when he was approached by the CFO of that particular dealership group with an investment opportunity.  This individual told Mr. Lash that if he, and others, invested approximately $50,000, they would obtain an ownership stake in a dealership he was planning to buy.  Shortly after Mr. Lash paid the money, the entirety of his life savings at the time, he saw on the news that his investment had been stolen, and he had been defrauded. Immediately, Mr. Lash went to the bank and learned that the check he had issued had been cashed, and the money was gone.  A friend recommended that Mr. Lash speak with an accountant named David Gentile on Long Island, who may be able to help recuperate some of the stolen funds.  Mr. Gentile became Mr. Lash's personal and corporate accountant. Over the following years, Mr. Gentile helped Mr. Lash recover a significant portion of that lost investment.

In this capacity, Mr. Gentile became familiar with Mr. Lash's ascension through the ranks of the automobile dealership industry.  He began asking Mr. Lash to let him know if Mr. Lash ever came across any business investment opportunities in which they could partner.  Mr. Gentile routinely expressed interest in the automotive sector, and ultimately Mr. Lash did find an investment opportunity to share with Mr. Gentile.  They, along with other investors, purchased an

interest in a dealership.  The investment produced returns, and the investment group expanded and purchased additional dealerships.  *See, generally,* Tr., at 2994-2998.

Mr. Gentile wished to continue scaling up and purchasing more dealerships, however the other investors balked and were content to stay with what they had.  It was at this point that Mr. Gentile made the decision to form GPB.  Because of their relationship, Mr. Lash's designated role was to manage the automotive retail portfolio, but the fund also had additional portfolios for waste management, cold storage, information technology, real estate, and life sciences.  With respect to those portfolios, Mr. Lash had no involvement at any time.

Mr. Gentile, well aware that Mr. Lash had an extensive background in the automotive industry, asked Mr. Lash to operate the dealerships that the fund purchased.  Mr. Gentile and Mr. Lash met with Jeffrey Schneider, who at the time was running the Texas-based company Ascendant Capital, which raised money for funds by pitching investment opportunities to wealthy individuals, brokers, and investment managers.  Mr. Schneider and Ascendant Capital partnered with GPB and Mr. Schneider took charge of GPB's fundraising. Tr., at 2998:1-2999:12.

From the outset, the evidence established that Mr. Lash had a significantly different role in GPB than Mr. Gentile or Mr. Schneider.  Mr. Gentile was the head of the business that bore his name.  He ran the company, made business decisions for GPB, controlled the bank accounts, and directed employee actions.  Mr. Schneider was the fundraiser.  He specialized in marketing the funds to wealthy individuals, broker-dealers, and investment advisors who would then invest or solicit investment and provide capital for Mr. Gentile to allocate.  Mr. Lash's initial role was to source prospective auto dealerships for the fund to acquire, and to ensure that those dealerships in the fund's portfolio were properly managed.  As more and more dealerships were acquired, this role would later be split first with Patrick Dibre, and then subsequently with David Rosenberg as Mr. Gentile diminished Mr. Lash's responsibilities.

Mr. Lash was compensated based on the acquisitions which he successfully orchestrated as well as a salary derived from the dealerships owned by the fund.  Tr., at 3001:3-8.  He also owned 15% of the automotive portfolio in the fund.  Tr., at 3001:9-10.  However, his ownership of the fund was to satisfy automotive manufacturer policies, he did not receive compensation based on his 15% equity stake.  *See*, *generally*, Tr., at 3282-3284.  His financial benefits and stake in GPB were significantly less than both Mr. Gentile and Mr. Schneider. Mr. Gentile collected a 2% management fee for all incoming investment capital.  Tr., at 3004:11-21.  He also received board stipends from each dealership as well as acquisition fees.  *Id.*  Mr. Schneider received a percentage of total capital raised in addition to board fees from the dealerships.   Tr., at 3005:10-16.  Consequently, Mr. Gentile and Mr. Schneider received compensation for any and all capital raised and invested with GPB while Mr. Lash's income was directly tied to his ability to identify and acquire dealerships and ensure they were run competently.  The three compensation packages are significantly distinguishable.  Messrs. Gentile and Schneider received substantially more money than Mr. Lash during the years that they all worked at GPB.  In fact, Mr. Gentile set the amounts that Mr. Lash was paid, and, at times he even dictated what Mr. Lash had to do with money he received as a bonus.  *See*, Tr., at 3203:17-3204:13.

All final decisions within GPB were made by Mr. Gentile.  Mr. Lash would make suggestions about potential dealership acquisitions based on his industry knowledge and experience, but the ultimate decision about where to employ capital always rested with Mr. Gentile.  Similarly, all the decisions regarding the means and methodologies of raising capital were made by Mr. Schneider, and deference was always paid to Mr. Schneider when it came to questions regarding soliciting investments or distributions.  Mr. Lash never had autonomy to make any decisions on his own which would become binding on GPB, or veto any decisions made by Mr. Gentile or Mr. Schneider.  On the GPB Capital Holdings, LLC organizational chart, David Gentile, the CEO, stands alone at the top.  Beneath him was Roger Anscher, the COO.  There are then 14 people who collectively report up to Mr. Anscher, one of whom was Jeffrey Lash.  *See*, GPB Capital Holdings, LLC Org. Chart, attached as Exhibit D.

GPB first purchased the dealerships in which Mr. Lash and Mr. Gentile had prior ownership.  They were considered to be safe investments as GPB was already familiar with their operation and management.  Mr. Lash then became responsible for identifying alternative dealerships which GPB should target for acquisition and obtaining all the appropriate authorizations and permissions to facilitate the transfer of dealerships should the owners be willing to sell.

As part of the fund-raising, Mr. Schneider and Mr. Gentile made representations to potential investors that purchasing a share of GPB would yield an annual 8% return on the investment, in the form of a check received every month, to be paid **strictly** out of the revenues of the dealerships.  The evidence at trial showed that during the time-period covered by the instant Indictment, Mr. Lash was not meeting with any prospective investors or advisers and consequently never made representations or promises to investors about the percentage return on their investment.  Tr., at 3061:17-21.

During GPB's first year, the initial dealerships generated adequate revenue to meet the promised obligations to investors.  The fund-raising team went nationwide, soliciting capital and offering monthly checks as a reminder of how well their investment was performing, generating significant investment funds for GPB.  However, in 2014 some of the dealerships began to experience revenue problems.  GPB was not generating enough revenue through its dealership assets to pay the investors their promised distributions, threatening GPB's ability to send investors their checks.  Shortly after its inception, GPB was poised to significantly disappoint its investors by woefully failing to achieve its predicted earnings.

### b.    The Fraudulent Performance Guarantees and Movement of Funds

A full description and analysis of the performance guarantees is contained, *supra*, in the section concerning objections to the PSR.  We incorporate it by reference in our analysis of the §3553(A) factors as well.

Beyond the three fraudulent documents he signed and permitting Mr. Gentile to access his bank account, Mr. Lash was not involved in the fraud.  He managed the dealerships owned by the fund to best of his ability and tried to identify dealerships he believed would be profitable for the

-15-

fund to acquire. Moreover, he remained the voice in the room preaching caution when Mr. Schneider wanted to take excessive risks to encourage more investment. For example, Mr. Lash raised serious concerns when the idea was suggested to send out special distributions at a time when dealership performance did not support taking such action, but he was summarily dismissed by Mr. Schneider, who focused solely on what an extra distribution would mean for fund raising. Tr., at 3156:9-2157:21. In fact, Mr. Lash specifically communicated to both Mr. Gentile and Mr. Schneider that the special distributions being discussed were being described as "basically suicide." Tr., at 3159:17-22.

After the performance guarantees were executed, Mr. Gentile devised and orchestrated ways to direct funds through Mr. Lash back into the GPB accounts, simulating Mr. Lash paying his obligations under the guarantees. For example, on April 26, 2016 Mr. Gentile initiated a series of wire transfers with Mr. Lash, designed to pay off performance guarantees without Mr. Lash having to pay the full guarantee amount out of pocket. Money was transferred from GPB Realty Capital LLC, one of the other funds that comprised GPB, and was sent to Mr. Lash's corporate bank account. That same day, $1,050,000 was wired from Mr. Lash's corporate bank account to the GPB Automotive Portfolio LP bank account, the precise amount Mr. Lash owed on the 2015 performance guarantee. This was the basis for Mr. Lash's guilty plea. In another instance, Mr. Gentile initiated a bonus to Mr. Lash of $225,000 and then directed him to return it to the fund to pay off a portion of a performance guarantee. *See*, Tr., at 3203:17-3204:13. To be clear, Mr. Lash had no role in determining the methods used by Gentile to cover up the fraud represented by the performance guarantees.

Apart from the fraudulent documents, David Gentile used Mr. Lash's bank accounts to move money around to appear as though Mr. Lash was repaying his obligations under the guarantees. Mr. Lash has expressed deep and sincere remorse concerning his criminal actions in connection with the transfer of funds from his bank account. Mr. Lash was a conduit for Mr. Gentile to use his accounting knowledge to obscure the true source of funds going into the Automotive and Holdings portfolios.

In no way does this absolve Mr. Lash of the consequences of the choices which he has admitted he made. Our purpose is merely to demonstrate to the Court that Mr. Lash is in a significantly different position with respect to Mr. Gentile and Mr. Schneider for the purposes of determining a just sentence. His specific offense conduct is orders of magnitude below that of his co-defendants.

### c.    Resignation from GPB and Settlement Negotiations

Mr. Lash worked at GPB for approximately four years, voluntarily resigning and negotiating his exit from the company towards the close of 2017, and an agreement was finalized in February 2018. Tr., at 3077:10-14; 3209:25-3210:7. By this point, Mr. Lash's relationship with Mr. Gentile had completely broken down and Mr. Lash desperately wanted to leave GPB. There was so much animosity felt by Mr. Gentile towards Mr. Lash that Mr. Gentile would not even take part in the negotiations or agreement to divest Mr. Lash from GPB, despite repeated attempts by Mr. Lash to speak directly to him. Tr., at 3211:2-12. This situation is emblematic of the power

dynamic between Mr. Gentile and Mr. Lash. They were not partners, they were not equals, there was a massive disparity between their respective roles and authority at GPB.

Even without Mr. Gentile personally participating, the negotiations were contentious. Mr. Lash testified that he was essentially forced to personally assume responsibility for certain debts incurred by Mr. Gentile, i.e. a Ferrari that Mr. Gentile had a GPB dealership purchase for his own personal use (Tr., at 3212:3-18), as well as a provision that Mr. Lash personally pay the remaining $680,000 of the performance guarantee debt for which Mr. Gentile had previously promised Mr. Lash that he would not ever be financially responsible (Tr., at 3212:19-3213:18). GPB effectively strong-armed Mr. Lash into agreeing to these manifestly unfair provisions of a separation agreement by threatening to withhold the entirety of the financial interest to which Mr. Lash was entitled and forcing him to sue GPB in protracted litigation to get the money he was owed. Tr., at 3214:11-20. When he tried to push back on these items in the agreement, Mr. Rosenberg and Mr. Silverman called him late one night and told him he had to accept the deal, as it was, right then, or they would just refuse to pay him anything unless and until he was able to successfully sue them and get a money judgment. *Id.* Mr. Lash did not want to spend years fighting to recover what he was rightfully due and instead elected to just accept the terms. Jeffrey Lash needed the money to provide for his family, while David Gentile sought to unethically capitalize on Mr. Lash's position and refused to deal in good faith.

### B.    History and Characteristics of the Defendant

"It has been consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). In this particular case, Mr. Lash's lack of any historical contact with law enforcement, his nature and character as exemplified through the myriad letters written on his behalf, his limited role in the wrongdoing, and his concerted efforts to make amends through cooperating and shining light into the fraud all serve as powerful mitigation and strongly support a non-incarceration sentence.

### i.    Personal Background

Jeffrey Lash was both in Northampton, Massachusetts to Robert and Ann Lash, in what was, in many ways, the archetype for a typical American family. His father, his Uncle Richard, and his Aunt Marilyn had also grown up in Northampton with their parents, Dale and Helen Lash. The Lash's lived a quiet suburban life. His Uncle Richard, who was known as "Richie," was a renowned local athlete who sustained several hits playing football which resulted in a loss of consciousness. Shortly after graduating high school, Richie Lash began experiencing cognitive decline, becoming disoriented and confused. He began a regular treatment of physical therapy and mental health counseling and was diagnosed as schizophrenic. His condition deteriorated rapidly to the point where he resided in an assisted living community by his late 30's. Mr. Lash keenly remembers his teenage years, driving over to the assisted living home with his parents to pick up his Uncle Richie and bring him to their house for the holidays. His uncle passed away at 40 years old.

The difficulties of processing the untimely decline and death of his uncle aside, Mr. Lash's childhood was fairly standard. As a boy, he would play with his brother and their friends outside in the neighborhood until dinnertime, at which point they would return home for a family dinner with both parents. They played sports, rode their bikes, and wasted their time in the way young boys do. Mr. Lash never got into any serious trouble, never had any interactions with law enforcement, and was never subject to serious or lasting discipline at home or at school.

By the age of six, it was evident that Mr. Lash had developmental issues with reading and comprehension. While his math skills would remain age-appropriate throughout his schooling, his reading and writing lagged early. His parents tried several possible solutions to aid him, even attempting to use corrective eye surgery to improve a slight lazy eye condition. Nothing ultimately worked, and by the fifth grade, Mr. Lash's language arts skills were far enough behind that he was required to repeat that year in school.

While he struggled academically, Mr. Lash was gifted with a strong work ethic. During his senior year of high school, he was promoted to managerial role at the restaurant where he worked. He learned basic bookkeeping and inventory management. He remained at this restaurant for approximately a year after he graduated high school before taking a job at a local Nissan dealership. From that point onward, his entire career revolved around the automobile industry.

Mr. Lash had always been interested in cars. Throughout high school, the father of a friend of his was restoring a car and Mr. Lash spent a lot of time with his friend's father learning the mechanics of how automobiles operate. At the Nissan dealership, he worked in the sales department while also attending part time college courses. He continued to struggle with school, finding that he felt much more comfortable in the corporate world.

### ii.    Professional Development, Marriage, and Family Life

As he was slowly working towards obtaining a college degree, he was presented with an opportunity at General Motors. The job required travel and training for several months in New York. Mr. Lash took the time away from school and ultimately decided to continue working and not return. At General Motors, Mr. Lash worked with certain aspects of vehicle warranties, which allowed him to combine his technical knowledge of cars with his friendly and affable nature in speaking to people.

He excelled in this new role, was promoted frequently to a point where he was overseeing warranties for multiple stores in his region and was relied on heavily by supervisors and managers. After a few years, a position opened as the service director for all the dealerships in the region where Mr. Lash was working, headquartered in Queens, New York. Despite his lack of experience in overseeing so many employees in that role, he was offered the job. He quickly became acclimated to the new position, and the service departments under his management improved dramatically.

After a few years serving as the service director, Mr. Lash met Danielle Finck while out with friends. They began dating. Five years into their relationship, Mr. Lash was offered the opportunity to operate his own auto dealership in Springfield, Vermont. The two moved together

-18-

to Vermont, where Mr. Lash took over the dealership.  Over the following year, the dealership became profitable and the operation was smooth, but the opportunity for Mr. Lash to purchase ownership of the dealership did not materialize as expected, and, as a result, Mr. Lash and Ms. Finck transitioned back to New York.

Mr. Lash was offered the opportunity to operate a Honda dealership in White Plains, New York.  He and Ms. Finck settled back to life in northern New Jersey and got engaged.  Ms. Finck, an attorney, was working at a New York City law firm at the time.  After turning around the lagging Honda dealership, Mr. Lash was asked to oversee a group of dealerships in Greenwich, Connecticut.

Mr. Lash and Ms. Finck bought a house in Sandy Hook, Connecticut and got married on November 9, 2002.  The Lash's lived and worked in the Connecticut and New York City area for approximately a decade, where Mr. Lash continued to oversee automobile dealerships and grew his reputation as an honest, knowledgeable, and competent executive.  In 2013 the Lash family relocated to Naples, Florida from New York and have been residing in Florida ever since.  The Lash's have four children.  Emily, the eldest, and Dylan attend college at Florida State University, located in Tallahassee, Florida.  Kylie and Cole are attending high school at present.  Kylie will be a senior and Cole is entering high school as a freshman.

Family is exceptionally important to Jeffrey Lash.  As his mother, Ann Lash, writes:

> **Tenderness is exemplified in the wonderful relationship Jeff has with his four teenagers.  He has taught them to work hard and use their considerable talents to better themselves and those around them.  Jeff's mantra has always been hard work, love of country and kindness to everyone no matter what their color or creed.**

*See*, Letter of Ann Lash, attached as Exhibit E.  Danielle Lash's sister, Dr. Christine Finck, describes how Mr. Lash was a constant source of support for her and her mother.  Dr. Finck was completing a pediatric surgery fellowship in Arkansas while her husband was suffering from a terminal brain tumor.  *See*, December 30, 2024 Letter of Dr. Christine Finck, attached as Exhibit F.  Even prior to his marriage to Danielle, Mr. Lash took it upon himself to travel to Arkansas to help care for Dr. Finck's husband during this incredibly stressful period.  *Id.*  Mr. Lash would "**take him to the doctor, [cook and clean], as well as helping him with the activities of daily living – not easy tasks.**"  *Id.*  Jeffrey Lash has always put his family first.

Describing memories of her father from childhood, Mr. Lash's daughter Kylie Lash recounts how, regardless of how tiring or stressful a workday Mr. Lash had, he always made sure to make time to play with the kids when he got home.  *See*, Letter of Kylie Lash, attached as Exhibit G.  Mr. Lash would unfailingly bring home "**the same peanut butter sundae for [his wife] … and head straight to the playroom to play with us and re-assemble all the toys we had somehow broken during the day.**"  *Id.*  Putting his family first is simply second nature.

Even Mr. Lash's business contacts recognize how important his family is to him. Henry Kwartler, the owner of an advertising agency that has worked for decades with Mr. Lash's dealerships, writes "**I know that Jeff is a great family man, as he is always speaking proudly of his wife and children.**" *See*, January 22, 2025 Letter of Henry Kwartler, attached as Exhibit H.

In the meantime, similar to his family, his professional reputation was also growing. Mrs. Lash also recounts visiting one of the upstate New York dealerships that he ran, "**we met many of the over 70 employees who told us stories of how Jeff had helped them achieve their goals in the car business.**" Ex. E. Mr. Lash always preferred to lead by example at his dealerships. He treated all employees and vendors with "**honesty, helpfulness, and a straightforward approach throughout all business dealings.**" *See*, November 4, 2024 Letter of Charles Hardy, attached as Exhibit I. In addition to recounting how Mr. Lash had helped her family during a particularly difficult time, Dr. Finck has also witnessed how Mr. Lash interacted with his employees, "**I have witnessed Jeff take employees that are struggling financially and give them a few months' rent to get them through.**" Ex. F.

What is striking about the way that Mr. Lash operates professionally is his approach to both his subordinates and peers. Mr. Lash shows the same level of respect and deference to everyone, regardless of their position. As business associate Jeff Selnick specifically noted:

> **I work with a lot of stores in the area and everyone I've dealt with says the same thing, he is a class act and extremely smart dealer that understands people and has an uncanny ability to connect with people on every level, whether talking to the janitor or executive of a bank.**

*See*, January 9, 2025 Letter of Jeff Selnick, attached as Exhibit J. The real connections that Mr. Lash establishes with everyone in his orbit fully demonstrate his true character. He has a real desire to improve the lives of everyone around him and be an uplifting force both personally and professionally.

Nobody knows Jeffrey Lash better than Danielle Lash. They have been married for over 22 years. Her letter is replete with stories of his dedication to both their immediate family as well as the many children they would foster together. *See*, December 2, 2024 Letter of Danielle Lash, attached as Exhibit K. Despite his work at GPB requiring so much time away from home, Mr. Lash always found a way to spend quality time with everyone in the household whenever possible. *Id.* She sums up his personality perfectly in one sentence, "**Jeff is the type of person who cannot see someone suffer without offering significant assistance.**" *Id.* Whether ensuring that employees have the ability to purchase gifts for their own families at Christmas, or learning an employee had become homeless and paying rent on a new apartment, Danielle would often learn of these charitable acts from the beneficiaries rather than from Mr. Lash, who never sought to brag or wanted a spotlight.

Ms. Lash also recounted how both she and Mr. Lash lived through the horror and terror of the December 2012 Sandy Hook school shooting. *Id.* They relocated to Florida because they

desperately wanted to get away from the palpable fear and lockdowns. *Id*. Danielle Lash understood that moving would mean that Mr. Lash would have to travel extensively, but he was willing to do it for the sake of his family. *Id*.

Kevin Lash is Jeff's brother separated by only 18 months. Their childhood was spent playing games and sports together. This developed into a close bond throughout their adulthood. Kevin Lash, like so many others, recognizes his brother to be a man of "**deep integrity, dedication, and commitment to his family and community.**" *See*, Letter of Kevin Lash, attached as Exhibit L.

Mr. Lash clearly treats his family with an uncommon generosity of spirit, and he treats his business associates like family. Many individuals have written letters to the Court recounting anecdotes concerning Mr. Lash offering private acts of kindness, not for personal benefit or accolades, but simply because he has a personal desire to lend a hand where he is able to alleviate someone else's burden. Domenico Assalone, a long-time business partner of Mr. Lash, shared that when he learned that he was in a health crisis and needed a kidney transplant, Mr. Lash was the first person to get himself tested to see if he could match as a donor. *See*, July 29, 2024 Letter of Domenico Assalone, attached as Exhibit M. This is a man who treats everyone around him like close family.

Perhaps the best example of Mr. Lash's earnest desire to be a source of support for people who are struggling comes from the letter from Kiara Nanda. Ms. Nanda is close friends with Mr. Lash's eldest daughter, Emily. While she was a teenager, Ms. Nanda lived with just her father, who became seriously ill. Ms. Nanda describes how Mr. Lash immediately stepped in to act as a surrogate parent to a teenage girl facing a world newly fraught with uncertainty. Mr. Lash ensured that Ms. Nanda made it to school on time, took her to the hospital to visit her father, was there to talk when she needed to unburden herself or was feeling anxiety about the future. She writes:

> **I can't count the number of times he gave me advice or guidance that I still use to this day when I am overwhelmed by the challenges in my life. His comforting demeanor, wisdom, and genuine care made me feel like I had a second father figure during one hardest periods of my life.**

*See*, Letter of Kiara Nanda, attached as Exhibit N.

Mr. Lash himself wrote a letter to Your Honor expressing his sincere remorse. He acknowledges that his actions caused real harm to investors and that he is haunted by that knowledge. *See*, Letter of Jeffrey Lash, attached as Exhibit O. Recognizing that he betrayed the trust of people and organizations who trusted GPB, and him, with their money, he is ashamed and humiliated by the pain and loss that has been suffered. *Id*. He does not minimize his personal failure and does not mince words about the choices he made.

There are many more letters of support which we encourage the Court to read through, additional stories of Mr. Lash's generous spirit and professional integrity. These letters showcase

the true character of a man who is trying to make amends.  The remainder of these letters are attached collectively as Exhibit P.

### iii.   Deterrence

In the context of sentencing a defendant, the concept of deterrence is two-fold.  First, there should be deterrence from the defendant committing further criminal activity.  Second, the general public should be deterred from engaging in the defendant's behavior.

The Court should take great comfort that Mr. Lash will not participate in any future criminal activity, and certainly not of the same nature as the instant case.  Mr. Lash's expertise lies in automobile dealerships.  He understands the operation, and maintenance, of stores within this industry.  Prior to his involvement with GPB, he had no interest or understanding in the selling of securities, or fund partnerships.  Has both has no desire to engage in that industry ever again, and he is legally barred from doing so.  However, over his decades-long career as a dealership operator, he has historically proven himself to be competent and capable and sought after by many different automobile manufacturing companies.  Given what happened at GPB, his arrest and prosecution, the reputational damage he suffered, the publicity of his testimony, the pain and anguish this situation has caused to his family, and the financial burden his actions caused, Mr. Lash is dedicated to remaining on the straight and narrow path and will comply with any law enforcement oversight imposed to ensure he does not stray.

With respect to deterrence to society at large, even with a non-incarceratory sentence, Mr. Lash serves as a cautionary tale.  His actions, while minimal compared with the two men who have already been sentenced, have still had a lasting and detrimental impact on his life in ways that no person will want to emulate.  Sentencing Mr. Lash to time served, or placing him on probation, along with the significant forfeiture which he has already paid, will serve the goals of ensuring that the community is made aware of the legal repercussions of, and sufficiently dissuaded from any participation in a fraudulent enterprise.

### iv.   Mr. Lash's Extensive Cooperation with the Government

#### a.   The Instant Case

Mr. Lash played a substantial role in the Government's prosecution of Gentile and Schneider.  In addition to testifying over three grueling days, he spent countless hours with the Government walking through discovery documents, explaining certain transactions, and filling in the gaps concerning email/text exchanges between himself, Mr. Gentile, and Mr. Schneider.  He corroborated the statements of other GPB employee witnesses and provided keen insights into how the management side of GPB was focused on securing investor money over adherence to rules and statutes.  In short, he was a model cooperator and asset for the Government in this case.

On June 6, 2023, Mr. Lash  pleaded guilty to Count V of the Indictment pursuant to a cooperation agreement with the Government.  Mr. Lash agreed to provide substantial assistance, to meet with the Government at their discretion, and to testify at trial should his testimony be

necessary.  In exchange, the Government promised to move the Court for a downward departure pursuant to USSG § 5K1.1 and show Mr. Lash leniency.

Mr. Lash had had enough, he recognized that what had transpired at GPB was wrong, and he wanted to clear his conscience and set things right.  He spent countless hours attending in-person and virtual meetings, answering questions, providing new documents and offering context to documents already in the Government's possession, filling in gaps in written communications, and corroborating information, especially on financial transactions, for the Government.  He was unfailingly cooperative and there were no issues concerning his candor or willingness to meet and provide information.  He acknowledged his role in the charged scheme, and how his actions had helped Mr. Gentile and Mr. Schneider perpetrate the fraud farther.  For that, he is truly sorry.

His cooperation ultimately culminated in his multi-day testimony at Mr. Gentile and Mr. Schneider's trial.  He testified on direct examination about his own participation in the scheme, he explained exactly what he had done and why he decided to plead guilty.  He subjected himself to a grueling cross examination where it became clear that he was being totally honest about everything he knew, had observed, and had done.  Mr. Lash was a pivotal witness in explaining to the jury, from an insider's perspective, exactly how the fraudulent scheme asserted by the Government was perpetrated against the unknowing investors.  There can be no doubt that Mr. Lash went above and beyond his obligation to offer substantial assistance to the Government in this matter.

As part of his cooperation agreement, Mr. Lash agreed to forfeit $3,347,506 (three million three hundred forty-seven thousand five hundred six dollars).  The first $2,000,000 (two million dollars) was due on or before the acceptance of the plea.  Mr. Lash duly paid this obligation on May 8, 2023.  The remaining $1,347,506 (one million three hundred forty-seven thousand five hundred six dollars) was due no later than 30 days prior to sentencing.  Mr. Lash completed this obligation on November 20, 2024.  He has fully satisfied his mandates and has no further obligations under his cooperation agreement.

### b.    The Securities and Exchange Commission

In addition to cooperating with the United States Attorney's Office, Mr. Lash is also cooperating with the Securities and Exchange Commission in the case of *SEC v. GPB Capital Holdings, LLC, et al*, 21 Cv 583 (MKB) (E.D.N.Y.).  On January 4, 2023, Mr. Lash signed a cooperation agreement with the SEC, indicating his desire to assist the Government in that matter as well.  *See*, SEC Cooperation Agreement with Jeffrey Lash, attached as Exhibit Q.  Further, as of March 23, 2023, the consent and judgment in that case was entered as well.

The contours of Mr. Lash's cooperation with the SEC will be more thoroughly explored once the criminal matter is settled and sentencing has taken place.  While it is rare that the SEC actively seeks out cooperating witnesses, in this particular case, it made an exception for Mr. Lash due to his perceived ability and willingness to assist its case.  Although Mr. Lash has not spent a considerable amount of time meeting with SEC enforcement lawyers as of yet, the mere fact that he has already signed a cooperation agreement on January 4, 2023 demonstrates his continued eagerness to assist the Government in making amends for his conduct and ensuring that the

investors are repaid for any losses suffered as a result of GPB's fraudulent practices. We urge the Court to consider not just Mr. Lash's cooperation in the instant case, but also his future cooperation in the SEC matter when determining a just punishment for Mr. Lash's actions.

### C.    Restitution

With respect to restitution, we respectfully request that the Court hold the issue in abeyance to permit further discussions with the Government.

## IV.    <u>CONCLUSION</u>

For the reasons set forth herein, Mr. Lash respectfully requests a that this Court sentence him to time served or, in the alternative, probation, as that would provide sufficient punishment, consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(A). A non-incarceratory sentence would take into account the seriousness of Mr. Lash's conduct, still uphold respect for the law, and constitute just punishment for the offense. Such a sentence would be sufficient, but not greater than necessary, to achieve the statutory aims imposed by the sentencing guidelines.

DATED:      August 19, 2025
            New York, New York

                                          RESPECTFULLY SUBMITTED,

                                          GOTTLIEB TOWNSEND
                                          By: Robert C. Gottlieb, Esq.

                                          /s/ Robert Gottlieb
                                          Robert C. Gottlieb, Esq.

                                          THE JANEY LAW FIRM PC
                                          By: Derrelle M. Janey, Esq.

                                          /s/ Derrelle Janey
                                          Derrelle M. Janey, Esq.

cc: All Counsel of Record (via ECF)